UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

EMMETT J. JAFARI,

                                    Plaintiff,

        v.                                          Action No. 3:08–CV–629

OLD DOMINION TRANSIT
MANAGEMENT COMPANY d/b/a Greater
Richmond Transit Company,

                                    Defendants.

MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant's Motion to Dismiss pursuant to

Federal Rule of Civil Procedure 12(b)(6) (Docket No. 2), filed October 2, 2008.  For the

reasons that follow, the Court will GRANT the Motion in part and DENY the Motion in part.

## I. Background

### A. Procedural History

Emmett J. Jafari filed a Sworn Motion for Judgment against the Old Dominion

Transit Management Co. d/b/a The Greater Richmond Transit Co. ("GRTC") in the Circuit

Court for the City of Richmond (Case No. 760CL08004073-00) on August 25, 2008.  On

September 22, 2008, Plaintiff filed a Motion to Amend Sworn Motion for Judgment.

Defendant filed Notice of Removal (Docket No. 1) with this Court on September 26, 2008,

invoking federal question jurisdiction under 28 U.S.C. § 1331 as a result of allegations

attempting to vindicate rights under the Employee Retirement Income Security Act

1

("ERISA") and the Fair Labor Standards Act ("FLSA"), over which this Court has original jurisdiction.  Simultaneously, Defendant filed the instant Motion to Dismiss.  Plaintiff initially responded with a Motion to Remand (Docket No. 4), filed October 6, 2008, but Plaintiff subsequently filed a Motion to Withdraw Motion to Remand (Docket No. 6), on October 17, 2008.  The Court granted the Motion to Withdraw in an Order dated October 21, 2008 (Docket No. 7).

### B.  Factual Background

On February 20, 2006, Defendant offered and Plaintiff accepted a contract for at-will employment ("Employment Contract") exclusive to Defendant's participation in the Virginia Initiative for Employment not Welfare ("VIEW").[1]  This contract provided Plaintiff with the power to "exercise discretion and judgment in the execution of his duties." (Mot. J. ¶ 25.) Plaintiff notes that the Commonwealth requires employers like Defendant to enter into contracts ("VIEW Agreements") with local Departments of Social Services ("DSS").[2] Plaintiff believes that the VIEW Agreement between GRTC and the local DSS also provided

---

[1] The VIEW Program seeks "to reduce long-term dependence on welfare, to emphasize personal responsibility and to enhance opportunities for personal initiative and self-sufficiency by promoting the value of work," and governs the availability of Temporary Assistance for Needy Families ("TANF") services, see Va. Code Ann. § 63.2-600 et. seq, for specified individuals. Va. Code Ann. § 63.2-608(A).

[2] Although he does not provide a citation, the Court may presume that Plaintiff refers to Va. Code Ann. § 63.2-608(D)(2)(d)(viii).  The statute states, "[Full Employment Program or] FEP employers shall:  Sign an agreement with the local department outlining the employer requirements to participate in FEP.  All agreements shall include notice of the employer's obligation to repay FEP reimbursements in the event the employer violates FEP rules."

him the authority to monitor C-Van drivers[3]—although he simultaneously "had no supervisory responsibilities" and "was eligible for overtime pay." (Id. at ¶ 5.)  In addition, Plaintiff states that Defendant represented it would provide noncontributory benefits to Plaintiff at the completion of a probationary period. (Id.)

At some point in 2006, Defendant notified its employees of a new compensation plan.  In November 2006, after recognizing that he was not being compensated according to the compensation plan, Plaintiff raised this concern in a letter to Kimberly W. Ackerman, GRTC's employee benefits plan administrator.  Apparently, in December 2006, Ackerman agreed with Plaintiff's observation that he was not being paid according to the compensation plan and stated that the issue would be addressed at Plaintiff's February 2007 evaluation.  However, at the 2007 evaluation during which "Plaintiff received a near perfect" score, Ackerman evidently recommended a salary increase below the compensation plan range for which Plaintiff was eligible.

After the February 2007 evaluation, and after he raised further concerns regarding his wages and Defendant's treatment of VIEW clients and employees,[4] Plaintiff alleges that various GRTC officials, including Ackerman, Eldridge F. Coles, and Sandra L. Stanley,[5]

---

[3] "C-Van" drivers provide transportation to work and daycare facilities for VIEW clients referred to Defendant by the local DSS.

[4] According to Plaintiff, Stanley degraded and utilized racial epithets when referring to clients and employees. (Id. at ¶ 7.)

[5] Plaintiff states that Coles is an "executive and upper administrative employee[] . . . neither having direct supervision . . . nor interaction with Plaintiff." (Mot. J. ¶ 3.)  At the Motion to Dismiss hearing, the Parties acknowledged that Coles serves as the Chief Operating Officer of GRTC.  Stanley serves as a manager or trainer for GRTC's C-Van drivers. (Id. at ¶¶ 3, 6.)

began undermining the discretion given to him by the Employment Contract and VIEW Agreements.  Specifically, Stanley strictly enforced GRTC requirements that Plaintiff be on call every other weekend for a forty-eight hour period and "stressed scrutiny, and rigid enforcement of policy."[6] (Mot. J. ¶ 6.)  According to Plaintiff, GRTC never compensated him for this time on call or for overtime.

In April of 2007, GRTC began providing Community Assisted Ride Enterprise ("CARE") services in Henrico County, Virginia.  Defendant required Plaintiff to perform duties related to CARE, above and beyond his VIEW responsibilities.  Plaintiff claims Defendant failed to compensate him for these added CARE responsibilities, but Coles promised that GRTC would address Plaintiff's concerns at his second annual evaluation in February of 2008.

In October 2007, Coles stated to Plaintiff's supervisor, Von S. Tisdale, that he had received a VIEW client complaint that Plaintiff had apparently told the client, "if you have something to say, then say it to my face." (Mot. J. ¶ 43.)  Plaintiff alleges he never made the statement and that Coles refused to produce a copy of the client complaint when Tisdale requested it.  Plaintiff asserts that, after this statement to Tisdale, Coles restricted Plaintiff's interaction with VIEW clients by telling Tisdale he did not want Plaintiff "to go to a client's home unless a dispatcher or supervisor sent him." (Mot. J. ¶ 14.)  However, at the same

---

Plaintiff has named none of these individuals as defendants but does identify them as managers within GRTC who "at all relevant times acted in furtherance and within the scope of their GRTC employment." (Id. at ¶ 3.)

[6] It is not clear what Plaintiff means by "stressed scrutiny, and rigid enforcement of policy." (Mot. J. ¶ 6.)

time, Plaintiff states, "GRTC made no policy, did not specify the restrictions placed upon Plaintiff, nor issue such limits to any of its other Supervisors [sic]." (Id.)

In December 2007, Plaintiff, unsatisfied with Defendant's response to his concerns about wages, filed an internal "official complaint" regarding his wages and Coles's statement

to Tisdale. (Id. at ¶¶ 15, 37.)  This "official complaint" came in the form of a letter to Ackerman.  Afterward, "[p]ersonally, and via emails, Coles asked Plaintiff to work with GRTC, and stated, 'we're going to take care of everything' when [Coles] saw [Plaintiff] on the property." (Id. at ¶ 15.)  Because of this statement and Coles's statement that Plaintiff need not "go anywhere else on this[,]" Plaintiff "postponed seeking outside assistance." (Id. at ¶¶ 16, 37.)  Apparently, Defendant did not further address Plaintiff's internal complaint until February 2008.

In January 2008, after GRTC's response to Plaintiff's internal complaint, Plaintiff informed Coles that the response had failed to satisfy him.[7]  In addition, complaints about Plaintiff were discussed at a "weekly departmental meeting."[8] (Id. at ¶ 19.)  Plaintiff then had several meetings with various GRTC officials regarding his performance in January 2008.  During one such meeting on January 18, 2008, Coles and Ackerman apparently interrogated Plaintiff about failing to approve driver leave requests and going to a client's house against orders, and Coles ended the meeting by telling Plaintiff he would be fired if

---

[7] Plaintiff does not specify how Defendant responded to the internal complaint.  He states only, "GRTC's response addressed no substantive issue raised." (Mot. J. ¶ 16.)

[8] Plaintiff does not specify who attended this meeting or discussed the complaints.

Coles discovered any wrongdoing on Plaintiff's part.  At some time, it is unclear whether before or after this January 18, 2008 meeting, Coles spoke to various employees and supervisors about Plaintiff to "ask[] their opinion about Plaintiff." (Id. at ¶ 20.)

On February 1, 2008 , after Plaintiff returned from "illness due to GRTC's harassment practices," Coles requested that Plaintiff attend a meeting with Ackerman and Stanley (the "Discharge Meeting"). (Mot. J. ¶¶ 19-20.)  When Ackerman entered the room, she handed Coles a letter, which Coles in turn handed to Plaintiff (the "Termination Letter").  In addition to the information in the Termination Letter, Coles verbally informed Plaintiff that his employment had been terminated because Plaintiff's "supervisory skills ha[d] diminished." (Id. at ¶ 21.)  The Discharge Meeting occurred prior to Defendant's second annual evaluation, which would have taken place on or about February 20, 2008.

Based on these events, Plaintiff claims Defendant has breached the Employment Contract, the VIEW agreements, and at least one implied contract; violated ERISA, FLSA, and Virginia public policy based upon both federal statutes; failed to pay wages when due; and defamed Plaintiff.

## II.  *Legal Standard*

A motion to dismiss tests the legal sufficiency of a complaint. Randall v. United States, 30 F.3d 518, 522 (4th Cir. 1994).  In contemplating a 12(b)(6) motion, the Court must consider "all of the facts alleged, taken collectively, . . . not whether any individual allegation, scrutinized in isolation, meets [the] standard." Tellabs, Inc. v. Makor Issues & Rights, Ltd., __ U.S. __, 127 S. Ct. 2499, 2509 (2007).  Additionally, the Court must "take

the facts in the light most favorable to the plaintiff," but "need not accept the legal

conclusions drawn from the facts," and "need not accept as true unwarranted inferences,

unreasonable conclusions, or arguments." Giarratano v. Johnson, 521 F.3d 298, 302 (4th

Cir. 2008) (citing E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th

Cir. 2000)).  Moreover, the Court need not "accept as true a legal conclusion couched as a

factual allegation." Bell Atl. Corp. v. Twombly, __ U.S. __, 127 S. Ct. 1955, 1965 (2007)

(quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).  Moreover, the Court cannot simply

accept a plaintiff's declaration of a legal claim's essential elements.  In sum, the Complaint

must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible

on its face." Twombly, 127 S. Ct. 1965.

### III.  *Discussion*

A.  ERISA Claims

Plaintiff fails to sufficiently allege a violation of ERISA or Virginia's public policy on

ERISA.  Without pointing to any particular section of ERISA, Plaintiff claims:  (a) GRTC's

extension of noncontributory employee benefits created a unilateral contract, which it

subsequently breached by terminating his employment and benefits without notice to

Plaintiff, "thereby depriving Plaintiff of his job and benefits plans property rights" (See Mot.

J. ¶ 31; Am. Mot. J. ¶ 4); (b) Defendant acted arbitrarily in bad faith by terminating

Plaintiff's noncontributory benefits before his February 2008 evaluation such that Plaintiff

could not "vest in [Defendant]'s benefit plans" (Am. Mot. J. ¶ 4); and © Defendant has

offended Virginia's public policy regarding ERISA which protects "the property rights, personal freedoms, health, safety or welfare of people in general" (<u>Id.</u> at ¶ 5).

### 1. Breach of Unilateral Contract

To begin, the Court need not accept Plaintiff's legal conclusion that ERISA benefits create a binding unilateral contract and require notice of benefits termination prior to discharge. Giarratano, 521 F.3d at 302. Even though some courts have identified ERISA benefits as unilateral contracts, no authority requires or compels this court to interpret ERISA benefits as such on the instant factual allegations.[9]

### 2. Lack of Notice Prior to Termination

Next, it is entirely unclear in the pleadings upon what authority Plaintiff relies to contend a lack of notice creates a violation of ERISA. In fact, Plaintiff fails to clearly indicate exactly what kind of notice regarding ERISA benefits should have been given to him prior to his termination. No viable theory exists based on the present allegations.

As best the Court can tell, Plaintiff attempts to utilize this ERISA theory as an alternative means of challenging his discharge. Not only does Plaintiff allege, "GRTC

---

[9] The Court notes that there have been at least two instances in which courts have discussed ERISA benefits in terms of unilateral contracts. First, although inapplicable in this case, the Fourth Circuit commented that it would have allowed suit on estoppel or third party beneficiary theories, necessitating the finding of a unilateral contract, where promises of senior management induced employees to accept a new pension plan proposal, but such a finding would undermine a written insurance contract. Elmore v. Cone Mills Corp., 23 F.3d 855, 866-67 (4th Cir. 1994) (en banc). To state the obvious, the court refused to recognize the theory; moreover, the facts at issue there are clearly distinguishable from the instant case. Also inapplicable in this case, the Third Circuit has described certain "Top Hat" ERISA benefits for "highly sophisticated business executives" as "unique animal[s] . . . more akin to unilateral contracts than to trust-like structures normally found in ERISA plans." Scipio v. United Nat. Bankshares, Inc., 284 F. Supp. 2d 411, 417 n.10 (N.D. W. Va 2003) (discussing and quoting Goldstein v. Johnson & Johnson, 251 F.3d 433 (3d Cir. 2001), to determine the standard of review should be for abuse of discretion). Again, nothing in the allegations demonstrates the benefits offered by Defendant to Plaintiff match those at issue in Scipio.

instantly terminated Plaintiff, and Plaintiff's non-contributory benefits plans, before Plaintiff could resolve his complaint issues as promised by Coles, before Plaintiff could receive his annual raise . . . . thereby depriving Plaintiff of his job and benefit plans property rights." (Am. Mot. J. ¶ 4.)  Subsequently, under his ERISA allegations, Plaintiff states "GRTC's discharge of Plaintiff . . . is wrongful termination." (Mot. J. ¶ 34.)  Plaintiff again suggested ERISA provides protection against wrongful discharge at the hearing held on this Motion. (Mot. Dismiss Hr'g Tr. 27 ("[P]laintiff does not allege that GRTC failed through its Employee Benefits Program, that GRTC failed to pay benefits or claims under its plans. . . . [E]ven though Virginia is an at will state, at will doesn't mean you can simply do as you please."), 28 ("Plaintiff was a GRTC benefits plan participant.  And he cannot be terminated without notice. . . .").)  Plaintiff's contentions notwithstanding, the Fourth Circuit has roundly rejected attempts to utilize ERISA claims in this way. See Dzinglski v. Weirton Steel Corp., 875 F.2d 1075, 1078 (4th Cir. 1989) ("We reject appellant's attempt to transform the provisions of this early retirement plan [providing a hearing before a retirement committee] into a forum for a wrongful discharge action."); see also Taliaferro v. Assocs. Corp. of N. America, 112 F. Supp. 2d 483, 500 (D.S.C. 1999) ("ERISA is not the proper means through which to litigate the propriety of a discharge decision.").

Thus, Plaintiff's ERISA claim based on lack of advanced notice fails.

### 3.  Termination Before Benefits Could Vest

Plaintiff additionally alleges an ERISA violation because Defendant terminated his employment "before Plaintiff could vest in GRTC's benefits package." (Am. Mot. J. ¶ 4.)  It

is unclear whether or not Plaintiff has attempted to invoke 29 U.S.C. § 1140 to state a

retaliation claim.[10]  However, if this is the basis for Plaintiff's third ERISA claim, the claim

must fail.  The Fourth Circuit has instructed that "ERISA does not guarantee every

employee a job until he or she has fully vested into a company's benefit plan," but

"[r]ather, ERISA guarantees that no employee will be terminated where the purpose of the

discharge is the interference with one's pension rights." Conkwright v. Westinghouse Elec.

Corp., 933 F.2d 231, 239 (4th Cir. 1991) (quoting Dister v. Cont'l Group, Inc., 859 F.2d

1108, 1111 (2d Cir. 1988)).  Thus, in order to state a violation of § 1140, Plaintiff must

allege "specific intent of the employer to interfere with an employee's pension rights." Id.

Plaintiff has failed to do so.  Nothing on the face of the allegations demonstrates any

specific intent on the part of Defendant to take away Plaintiff's benefits in retaliation for his

utilizing them.  Nothing in the allegations suggests, or allows this Court to infer, that

Defendant stood anything to gain by terminating Plaintiff's benefits.  This Court is not free

to speculate based on the allegations that the noncontributory benefits provided to Plaintiff

were a motivating factor in Defendant's decision to terminate him. See Twombly, 127 S. Ct.

at 1965.

Thus, absent any allegation of specific intent on the part of Defendant, Plaintiff's

ERISA retaliation claim fails.

---

[10] In relevant part, 29 U.S.C. § 1140 states:  "It shall be unlawful for any person to discharge, . . . discipline, or discriminate against a participant . . . for exercising any right to which he is entitled under the provisions of an employee benefit plan, . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . ."

### 4.  Violation of Virginia's Public Policy on ERISA

Plaintiff has failed to properly allege an ERISA violation based on a violation of state public policy.  Under Bowman v. State Bank of Keysville, 331 S.E.2d 797, 801 (Va. 1985), a plaintiff has a cause of action against an employer who has attempted to use the threat of discharge to interfere with either an employee's statutory rights or established public policy. However, this doctrine is "not so broad as to make actionable those discharges of at-will employees which violate only private rights or interests." Miller v. SEVAMP, Inc. 362 S.E.2d 915 (Va. 1987).  As Defendant correctly points out, in Storey v. Patient First Corp., 207 F. Supp. 2d 431, 450 (E.D. Va. 2002), this Court has required, "[a]s a threshold matter, a plaintiff attempting to assert a wrongful discharge claim pursuant to Bowman must identify a Virginia statute that the employer-defendant violated by terminating the plaintiff."  A federal statute does not provide a permissible basis for a Bowman claim. Id.  Plaintiff has not identified any Virginia statute that GRTC violated when it terminated his employment.

Therefore, Plaintiff's ERISA claim based on violation of "Virginia's public policy regarding the Employees Retirement Income Security Act [ERISA], and such specified public policies as follow" fails.

### B.  FLSA Anti-Retaliation Claim

Plaintiff cannot allege a violation of the FLSA's anti-retaliation provision.  In relevant part, 29 U.S.C. § 215(a)(3) makes it unlawful for an employer:  "to discharge or in any other manner discriminate against any employee because such employee has filed any

complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]."

Relying on Rayner v. Smirl, 873 F.2d 60 (4th Cir. 1989), Plaintiff argues that the November 2006 and December 2007 letters he submitted to Ackerman triggers § 215(a)(3)'s protection. (Pl.'s Mem. Opp. Mot. Dismiss 8.)  The Court need not accept the legal conclusion that a complaint that is formal, but nonetheless internal, triggers the FLSA's protection. See Twombly, 127 S. Ct. at 1965.  Rayner is inapposite.  In that case, the Fourth Circuit was interpreting the "whistleblower" provision of the Federal Railroad Safety Act, 45 U.S.C. § 441—not the anti-retaliation provision of the Fair Labor Standards Act—when it stated that intra-corporate complaints trigger the FRSA's anti-retaliation provision. Rayner, 873 F.2d at 63-64.  As this Court stated in Boateng v. Terminex Int'l Co. Ltd. P'ship, 2007 WL 2572403, at *3 (E.D. Va. Sept. 4, 2007), "the reasons upon which the Rayner court based its decision were railroad and safety legislation-specific and therefore are not persuasive in the FLSA context."  Contrary to Plaintiff's argument, the Fourth Circuit has not "consistently opined that internal complaints do trigger the FLSA's anti-retaliation clause." (Pl.'s Mem. Opp. Mot. Dismiss 8.)  In fact, this Circuit has held quite the contrary.  In Whitten v. City of Easely, 62 F. App'x 477, 480 (4th Cir. 2003) (citing Ball v. Memphis Bar-B-Q Co., Inc., 228 F.3d 360, 364 (4th Cir. 2000)), the Fourth Circuit stated "the FLSA's anti-retaliation provision does not extend to internal complaints." Plaintiff's allegations clearly demonstrate that he filed his "official complaint," however formal, internally. (See Mot. J. ¶¶ 10 (complaint to Ackerman), 15 ("Plaintiff filed an official

complaint about GRTC's . . . improper wages.  GRTC's response addressed no substantive

issue raised."), 16 ("Plaintiff postponed pursuing outside assistance."), 37 ("Plaintiff, in

good faith, . . . postponed seeking outside assistance.").)

Thus, Plaintiff's FLSA anti-retaliation claim fails.

### C.   "Failure to Pay Wages When Due" Claim

Plaintiff also fails to state a claim for relief for "failure to pay wages when due"

because, as Defendant correctly points out, Va. Code Ann. § 40.1-29 provides the sole

statutory remedy for this particular claim.  According to the Virginia Code,

> The Commissioner [of Labor and Industry][11] may require a written complaint
> of the [employer's failure to pay wages when due] and, with the written and
> signed consent of an employee, may institute proceedings on behalf of an
> employee to enforce compliance with this section, and to collect any moneys
> unlawfully withheld from such employee which shall be paid to the employee
> entitled thereto. In addition, following the issuance of a final order by the
> Commissioner or a court, the Commissioner may engage private counsel,
> approved by the Attorney General, to collect any moneys owed to the
> employee or the Commonwealth.

The statute clearly demonstrates the Virginia General Assembly's intent that the

Commissioner of Labor and Industry pursue claims for unpaid wages such as the one

Plaintiff would have this Court pursue.[12]  "[W]here a statute creates a right and provides a

remedy for the vindication of that right, then that remedy is exclusive unless the statute says

---

[11] As Plaintiff correctly points out, § 40.1-29 refers to the "Commissioner of Labor and
Industry" and "his authorized representatives." See Va. Code. Ann. § 40.1-2 (2008).

[12] Plaintiff alleges Defendant (1) paid him below the compensation plan announced in
December 2006; (2) failed to pay him wages for the additional CARE duties it mandated he
perform starting in April 2007;(3) failed to pay overtime for time worked over 40 hours
during the week; and (4) failed to pay him for the 48 hour on-call periods he had to serve
every other weekend. (Mot. J. ¶¶ 25-32)

14

otherwise." <u>Sch. Bd. of City of Norfolk v. Giannoutsos</u>, 380 S.E.2d 647, 649 (Va. 1989)

(citing <u>Transamerica Mortgage Advisors, Inc. v. Lewis</u>, 444 U.S. 11, 19 (1979)).  There is

no authority upon which this Court could create a private right of action for Plaintiff where

none presently exists.  "Federal courts are courts of limited jurisdiction.  They possess only

that power authorized by Constitution and statute, which is not to be expanded by judicial

decree." <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 377 (1994).  Moreover,

"only Congress may alter a district court's subject matter jurisdiction," <u>U.S. v. Hartwell</u>, 448

F.3d 707, 717 (2006) (citing <u>Kontrick v. Ryan</u>, 540 U.S. 443, 453 (2004)), and it has not

done so under the instant circumstances.[13]

Thus, Plaintiff's claim for "failure to pay wages when due" necessarily fails.[14]

### D.  Breach of Written Employment Contract

---

[13] Although the Court need not address Plaintiff's argument that "the Virginia Department
of Labor and Industry has deferred to the Courts [sic]" in matters such as the instant case
(Pl.'s Mem. Opp. Mot. Dismiss 17), the Court notes that the document from the Virginia
Department of Labor and Industry that Plaintiff attached to buttress his argument states his
claim was returned because the claim exceeded the $15,000 limit for claims, Plaintiff had
filed a claim in the courts, and the claim was over the two year statute of limitations (Pl.'s
Ex. 1).  This document does nothing to create a private right of action that this Court may
entertain.

[14] To the extent that Plaintiff has attempted to plead a FLSA claim based on his on-call
duties, the Court notes that the Fourth Circuit has identified the standard for determining
whether on-call time is compensable under the FLSA. <u>Whitten v. City of Easely</u>, 62 F.
App'x 477 (4th Cir. 2003).  The Court must examine the level of interference with Plaintiff's
private life based on factors such as "(1) whether the employee may carry a beeper or leave
home; (2) the frequency of calls and the nature of the employer's demands; (3) the
employee's ability to maintain a flexible 'on call' schedule and switch 'on call' shifts; and
(4) whether the employee actually engaged in personal activities during 'on call' time." <u>Id.</u>
at 479.  Plaintiff has also failed to plead enough facts to survive a motion to dismiss, if he is
attempting to raise such a claim.

Plaintiff's claim for breach of a written contract fails.  Defendant argues that Plaintiff does not properly allege the existence of a contract because Plaintiff "does not identify the alleged contract or its terms" and "admits he was an 'at-will' employee," which means he could be "terminated for any reason without notice." (Def.'s Mem. Supp. Mot. Dismiss 9.)

Looking to the pleadings, Plaintiff clearly alleges the existence of a written contract. (See Mot. J. ¶¶ 5 ("Plaintiff responded to [Defendant]'s posting, was offered a contract, accepted the same, and was hired pursuant to consideration between he and [Defendant], on February 20, 2006."), 25 ("[Defendant] and Plaintiff executed a written Contract specific to VIEW empowering Plaintiff to exercise discretion and judgment in the execution of his duties for whatever duration his C-Van employment lasted.").)  Contrary to Defendant's assertion, Plaintiff clearly refers to a document separate from the statutory agreement defining Defendant's "duties" under VIEW or the job posting. (See Mot. J. ¶¶ 5, 25.)  He clearly alleges offer, acceptance, and valuable consideration. See Progress Printing Co., Inc. v. Nichols, 421 S.E.2d 428, 431 (Va. 1992).  Thus, Plaintiff has successfully alleged the existence of a written agreement with Defendant.

However, properly alleging the existence of the Employment Contract alone does not suffice to allege a breach of the Employment Contract.  Plaintiff has failed to state a claim for breach.  Plaintiff only states that Defendant "breached its Contract when, prior to his discharge, it removed Plaintiff's discretion and judgment." (Id.)  The Court need not accept as true the legal conclusion that a breach occurred. Papasan, 478 U.S. at 286.  As Defendant asserts, looking to the factual allegations, Plaintiff does not allege that the

16

Employment Contract precluded Defendant from limiting or removing Plaintiff's power "to exercise discretion and judgment in performing his job . . . in monitoring C-Van drivers and resolving VIEW complaints." (Mot. J. ¶ 25.) Plaintiff's factual allegations that Defendant in various ways limited his ability to monitor C-Van drivers or resolve VIEW complaints, taken as true, do not constitute a breach of the Employment Contract, where the Employment Contract contained no term proscribing GRTC from taking such actions.

Thus, Plaintiff has failed to assert facts that "raise a right to relief above the speculative level" or provide "enough facts to state a claim to relief that is plausible on its face." Twombly, 127 S. Ct. at 1965, 1974. The breach of written contract claim fails.

E. Breach of Implied Contracts

Plaintiff has failed to sufficiently allege existence, much less to say breach, of any implied contract. Plaintiff suggests two implied agreements with Defendant. Coles allegedly created the first agreement by stating the various concerns about Plaintiff's performance or his wages would be addressed at his February 2008 evaluation. The second agreement allegedly arose when Defendant gave Plaintiff additional duties under the CARE Program.

Virginia courts have refused to imply a contract where such a finding would undermine an express contract that has already defined the rights of the parties. See S. Biscuit Co., Inc. v. Lloyd, 6 S.E.2d 601, 606 (Va. 1940) ("[A]n express contract defining the rights of the parties necessarily precludes the existence of an implied contract of a different nature containing the same subject matter. . . . [T]he law will not imply an agreement in contravention thereof.") (citing Grice v. Todd, 91 S.E. 609 (Va. 1917); Ellis & Meyers

17

Lumber Co. v. Hubbard, 96 S.E. 754 (1918); County of Campbell v. Howard, 112 S.E.

876 (Va. 1922)).

1.      Implied Contract Not to Terminate Prior to Second Annual Evaluation

With regard to the first implied contract alleged, Plaintiff avers that Coles

"[p]ersonally, and via emails, . . . asked Plaintiff to work with [Defendant], and stated,

'we're going to take care of everything.'" (Mot. J. ¶ 15.)  According to Plaintiff, Coles also

stated that Plaintiff need not "go anywhere else on this." (Id. at ¶ 16.)  In a conclusory

fashion, Plaintiff further alleges "[Defendant] implemented a parol, *implied*, Contract of

specific time and duration when Coles promised Plaintiff that his concerns would be

resolved during his February 2008 eval [sic]." (Mot. J. ¶ 28 (emphasis in original).)  The

Court need not accept  as true the legal conclusion that Coles's statement creates a

contract—although the factual allegation of what Coles communicated to Plaintiff will be

accepted as accurate. See Twombly, 127 S. Ct. at 1965.

Simply put, the Court cannot imply a contract based on Coles's statements.

According to Plaintiff's own allegations, the Employment Contract was an express written

contract creating an at-will employment relationship. (See Mot. J. ¶ 5.)  If this Court were

to imply a contract not to terminate until the second annual evaluation, the Court would

undermine the express written agreement of the parties.  "In Virginia, . . . at-will

[employment] means that the employment term extends for an indefinite period and may

18

be terminated by the employer or employee for any reason upon reasonable notice."

County of Giles v. Wines, 546 S.E.2d 721, 723 (Va. 2001).[15]

The Court cannot imply an agreement based on Coles's comments to Plaintiff about the February performance evaluation.

2.   Implied Contract Based on Performing CARE Duties

With regard to the second alleged implied contract, Plaintiff has only alleged, in conclusory fashion, the creation of a "separate and additional, implied, Contract when it mandated that Plaintiff perform CARE duties." (Mot. J. ¶ 29.)  The Court notes, although it accepts as true the factual allegation that Defendant "mandated" performance of CARE duties, it need not accept the legal conclusion in this allegation that an implied contract existed. See Twombly, 127 S. Ct. at 1965.  More importantly, however, Plaintiff nowhere claims that this alleged implied contract was in fact breached.  Plaintiff only alleges

---

[15] Although Plaintiff only briefly mentioned the point at the hearing, the Court notes that Plaintiff cannot pursue, under an implied contract theory, a claim based on lack of "reasonable notice" because he was terminated at the Discharge Meeting without notice of the impending discharge prior to that meeting.  Explaining the tension between this Court's opinion in Perry v. Am. Home Prods. Corp, No. 3:96CV595, 1997 WL 109658, at *9 (E.D. Va. Mar. 4, 1997) (holding Virginia does not recognize a "reasonable notice" exception to the at-will doctrine where an employer failed to give employee notice of pending discharge before termination), and Laudenslager v. Loral, 39 Va. Cir. 228, 1996 Va. Cir. LEXIS 140 (Va. Cir. Ct. 1996) (holding failure to give prior notice of termination gives rise to a wrongful discharge claim under an implied contract theory), Brehm v. Mathis, 59 Va. Cir. 31, 2002 WL 851753, at *2 (Va. Cir. Ct. Mar. 13, 2002), held reasonable notice "has nothing to do with a time period before the termination becomes effective," but rather, "has everything to do with the nature of the notice," which "must reasonably notify the at will employee that he is terminated as of a certain date and time."  The court reasoned that to read the requirement otherwise "would eviscerate the [at-will] doctrine itself." Id.; cf. Perry, 1997 WL 109658, at *9.  Since the Termination Letter apparently notified Plaintiff that he was terminated as of the time of the Discharge Meeting (Mot. J. ¶¶ 21, 46), the reasonable notice requirement has been met.

Defendant breached the written Employment Contract by assigning him the additional

duties. (See id.)  As such, on the face of the allegations, no breach claim exists with regard

to Defendant assigning CARE duties to Plaintiff.[16]

Therefore, both claims for breach of implied contract fail.

### F.  Defamation and "Injury to One's Reputation" Claims

Plaintiff claims defamation based upon three statements:  (1) a statement from Coles

to Tisdale that a client had submitted a complaint about Plaintiff, (2)  statements made

about Plaintiff's job performance in the Termination Letter he was handed at the Discharge

Meeting, and (3) statements made to Plaintiff about his job performance at the Discharge

Meeting while others were outside the door.  Under Virginia law, there exists no distinction

between libel and slander. Fleming v. Moore, 275 S.E.2d 632, 635 (Va. 1981) (citing

Shupe v. Rose's Stores, 192 S.E.2d 766, 767 (Va. 1972)).  Therefore, to state a claim for

defamation Plaintiff must allege enough facts to raise beyond a speculative level:

"(1) publication of (2) an actionable statement with (3) the requisite intent." See Jordan v.

Kollman, 612 S.E.2d 203, 206 (Va. 2005).

The current factual allegations satisfy the required elements only with regard to the

statement from Coles to Tisdale.

### 1.    Actionable Statement

---

[16] Despite the absence of a breach allegation, the Court again notes that it cannot imply a
contract where an express agreement has already defined the employment relationship
between Plaintiff and Defendant. See Lloyd, 6 S.E.2d at 606.  Thus, the Court will not
imply formation or breach of this second alleged agreement.

Taking the second element first, Plaintiff can only demonstrate that the first two statements cited in the allegations are conceivably "actionable."  To be actionable, a statement must be a false statement of fact, not opinion. <u>Jordan</u>, 612 S.E.2d at 206-07. That is, "speech which does not contain a provably false factual connotation, or . . . which cannot reasonably be interpreted as stating actual facts about a person cannot form the basis of a common law defamation action." <u>Id.</u> at 206.  Importantly, false factual statements included in an employment performance review may support a defamation claim. <u>See Raytheon Technical Servs. Co. v. Hyland</u>, 641 S.E.2d 84, 90-92 (Va. 2007) (holding certain fact-based statements in a performance review were actionable, while other statements relating only opinions were not).

First, the statement from Coles to Tisdale that a VIEW client had submitted a complaint stating that Plaintiff had "told a client, if you have something to say, then say it to my face" (Mot. J. ¶¶ 14, 43), represents a statement of fact that, if false, could constitute defamation. <u>Jordan</u>, 612 S.E.2d at 206-07.  Second, the Discharge Letter contains a mixture of fact and opinion and also would be actionable. <u>See id.</u> at 90 ("While pure expressions of opinion are not actionable, '[f]actual statements made to support or justify an opinion . . . can form the basis of an action for defamation.'") (quoting <u>Williams v. Garraghty</u>, 455 S.E.2d 209, 215 (Va. 1995)).  To the contrary, the statement at the Discharge Meeting that "[Plaintiff's] skills as a supervisor have diminished to the point that we have to let you go," is not actionable.  It is a statement of opinion "relative in nature . . .

depend[ing] largely upon [Cole]'s viewpoint." <u>Hyland</u>, 641 S.E.2d at 91 (quoting <u>Fuste v. Riverside Healthcare Ass'n</u>, 575 S.E.2d 858, 861 (Va. 2003)).

As a result, only the statement from Coles to Tisdale and any factual statements contained in the Termination Letter could possibly support a defamation claim. Both of these statements arguably address Plaintiff's fitness for employment and may prejudice him in the performance of his trade, and, as such, could be considered defamation *per se*, if published with the requisite intent. <u>Great Coastal Exp., Inc. v. Ellington</u>, 334 S.E.2d 846, 849 (Va. 1985).

2.    <u>Publication</u>

Plaintiff has failed to properly allege publication of any facts in the Termination Letter. Publication occurs when an actionable statement is transmitted "to some third person so as to be . . . understood by such person." <u>Thalhimer Bros. v. Shaw</u>, 159 S.E. 87, 90 (Va. 1931); <u>see also</u> <u>Snead v. Harbaugh</u>, 404 S.E.2d 53, 55 (Va. 1991). Plaintiff has not alleged, and this Court cannot infer, that the letter was in fact communicated to anyone other than Plaintiff. As such, the factual statements in the Termination Letter could not have been transmitted "to some third person so as to be . . . understood" by that party. Thus, Plaintiff's allegations referring to the Termination Letter fail to state a claim for defamation, and only the statement from Coles to Tisdale remains as an actionable statement capable of sustaining a claim of defamation.

With regard to Coles's statement, Defendant relies on the intracorporate immunity doctrine stating, "Publication does not occur, however, when the alleged defamatory

statement is an intra-corporate communication." (Def.'s Reply at 8 (quoting Cobb v. Rector & Visitors of the Univ. of Virginia, 84 F. Supp. 2d 740, 750 (W.D. Va. 2000)).  However, the Virginia Supreme Court has specifically rejected arguments for "the absolute protection of the 'intracorporate immunity doctrine.'" Larimore v. Blaylock, 528 S.E.2d 119, 122 (Va. 2000).  While Cobb states, "there is no publication when a defamatory communication occurs between persons within a corporate entity who have a duty and interest in the subject matter," Cobb, 84 F. Supp. 2d at 750, this statement is undermined by the Virginia Supreme Court's later holding in Larimore which clearly rejects any absolute intracorporate immunity.  Instead, Larimore holds that statements transmitted within a corporate entity only triggers "a qualified privilege which shields the defendants from liability unless a showing of malice is made by clear and convincing evidence." 528 S.E.2d at 123.

Larimore in fact discusses the cases upon which the Western District relied in Cobb, specifically Chalkley v. Atlantic Coast Line R. Co., 143 S.E. 631, 638-40 (Va. 1928) and Montgomery Ward & Co. v. Nance, 182 S.E. 264, 269 (Va. 1935).  The Virginia Supreme Court determined that those cases only establish "that employment matters are occasions of privilege in which the absence of malice is presumed." Larimore, 528 S.E.2d at 121-23. This presumption—as well as the qualified privilege—can be lost if the statements are made with malice. Id.  As such, the Court rejects Defendant's argument for intracorporate immunity and, instead, examines whether a qualified privilege protects Coles's statement.

Defendant correctly points out that the statement from Coles to Tisdale enjoys a qualified privilege.  Plaintiff describes Coles as an "executive and upper administrative

employee[] of and for the said GRTC," apparently with the authority to fire Plaintiff. (Mot. J. ¶¶ 3, 19-21.)  Tisdale served as Plaintiff's direct supervisor at the time Coles spoke with her about the alleged VIEW client complaint. (<u>Id.</u> at ¶ 8.)  As such, both Tisdale and Coles shared a duty to monitor or manage Plaintiff's work performance when Coles told Tisdale that a complaint against Plaintiff had been filed by a client.

As a result, the qualified privilege protects Defendant from a defamation claim based on Coles's statement, unless the Court finds the requisite intent of malice existed when the statements were transmitted to Tisdale.

3.     <u>Requisite Intent</u>

"Unlike some jurisdictions, Virginia does not permit a qualified privilege to be defeated upon a showing of mere negligence," but rather requires "proof of common-law malice, that is, behavior actuated by motives of personal spite, or ill-will, independent of the occasion on which the communication was made." <u>Gazette, Inc. v. Harris</u>, 325 S.E.2d 713, 727 (Va. 1985) (citing <u>Story v. Newspapers, Inc.</u>, 118 S.E.2d 668, 670 (Va. 1961)).[17]

Defendant argues that Plaintiff fails to list any facts to satisfy the 12(b)(6) standard for common law malice.  The Court disagrees.  Although Plaintiff has alleged in conclusory

---

[17] Plaintiff has argued for a different malice standard focused solely on the alleged falsity of Coles's statement. (<u>See</u> Pl.'s Mem. Opp. Mot. Dismiss 12-13.)  In some instances, a plaintiff may prove defamation by showing "that the publication was false, and that the defendant either knew it to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based." <u>Ellington</u>, 334 S.E.2d at 852 (citing <u>The Gazette v. Harris</u>, 325 S.E.2d 713, 725 (Va. 1985)).  This level of "malice" basically amounts to a negligence standard, but, as Defendant correctly notes, the Virginia Supreme Court has rejected negligence in the qualified privilege context and instead applies the "common-law malice" standard enunciated in <u>Harris</u>. <u>See</u> 325 S.E.2d at 727.

fashion, "[Coles's] statements were abusive, malicious . . . and occasion special damages"

(Mot. J. ¶ 44), the Court need not accept any "legal conclusions drawn from the facts" or

"unwarranted inferences, unreasonable conclusions, or arguments." <u>Giarratano</u>, 521 F.3d

at 180.  Nonetheless, Plaintiff has alleged facts relevant to the issue of common-law malice

on Coles's part that allows a reasonable inference that Coles may have borne some ill-will

toward Plaintiff.  Before the alleged statement to Tisdale in October 2007, Plaintiff states

Coles knew that Stanley utilized racial epithets when referring to employees but apparently

did nothing about it, "cast aspersions" about Plaintiff, and asked co-workers for their

opinions about him—although Coles was not his direct supervisor. (Mot. J. ¶¶ 7, 12.)

Plaintiff also alleges Coles feigned receipt of VIEW complaints about Plaintiff—use of the

plural denotes at least one complaint in addition to the complaint Coles mentioned to

Tisdale. (<u>Id.</u> at ¶ 12.)  Further, Plaintiff alleges that Coles individually or in concert with

Stanley and Ackerman, "intentionally harassed Plaintiff." (<u>Id.</u> at ¶ 26.)  Subsequent to

Coles's statement to Tisdale, Plaintiff also alleges that Coles restricted Plaintiff's interaction

with VIEW clients, although no other supervisors had similar restrictions placed upon them

(<u>Id.</u> at ¶ 14.)  In addition, Plaintiff alleges that Coles at multiple times encouraged Plaintiff

not to pursue outside help with regard to Plaintiff's concerns about work conditions at

GRTC. (<u>Id.</u> at ¶¶ 15-16.)  Plaintiff also states that Coles, along with Ackerman, "launched

barrages of questions at Plaintiff," after the other C-Van supervisor had been dismissed

from a meeting, and announced "Coles' Policy" that Plaintiff would be fired "instantly" if

Coles had information about any wrongdoing by Plaintiff. (<u>Id.</u> at ¶ 19.)  Plaintiff also alleges

that Coles ordered complaints brought to GRTC's attention by Plaintiff be shredded and left out of a C-Van driver's record. (Id. at ¶ 20.)  Moreover, Plaintiff alleges that prior to Coles's intervention in the employment relationship, he "possessed a clean work record." (Id. at ¶ 44.)

At this stage of the proceedings, the Court is required to draw all reasonable inferences in favor of Plaintiff. Giarratano, 521 F.3d at 302.  Significantly, "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations," and the Court should not grant a motion to dismiss because it appears "recovery is very remote and unlikely." Twombly, 127 S. Ct. at 1965 (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989), and Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). Viewing the allegations collectively, Tellabs, Inc., 127 S. Ct. at 2509, and in the light most favorable to Plaintiff, the Court finds that Plaintiff has sufficiently alleged facts that reasonably suggest "personal spite[] or ill-will" on the part of Coles toward Plaintiff, "independent of the occasion on which the communication was made" from Coles to Tisdale about the VIEW client complaint. Harris, 325 S.E.2d at 727.  Thus, common law malice, which overcomes the qualified privilege to which a statement between company officials with an interest in Plaintiff's job performance and employment would otherwise be entitled, has been properly pleaded.

Plaintiff has successfully stated a claim for defamation with regard to this one statement.

G. <u>VIEW Claim</u>

Plaintiff fails to state a cognizable claim under VIEW.  Although Plaintiff repeatedly

refers to the statute's requirement that private companies enter into VIEW Agreements with

local agencies, there is nothing in the Virginia statute that provides to Plaintiff a private right

of action.  The Virginia Code in fact states, "None of the provisions of this chapter shall be

construed or interpreted to create any rights, causes of action, administrative claims or

exemptions to the provisions of the program, except as specifically provided in §§ 63.2-609,

63.2-613 and 63.2-618." Va. Code Ann. § 63.2-601 (2008).  None of the Sections

identified in § 63.2-601 remotely applies to Plaintiff.[18]

As such, Plaintiff's claims based on the VIEW statute will be dismissed for failure to

state a claim upon which this Court can grant relief.[19]

---

[18]These Sections solely provide rights to recipients of VIEW services.  Section 63.2-609
identifies individuals exempt from mandatory participation in VIEW.  Section 63.2-613
identifies certain "hardship exceptions" that prevent the Commonwealth from cutting off
TANF benefits in particular circumstances.  Section 63.2-618 provides the right to TANF
recipients to receive notice and appeal the loss of benefits prior to losing them.  Cf. <u>Goldberg
v. Kelly</u>, 397 U.S. 254 (1970) (requiring full evidentiary hearing prior to loss of welfare
benefits).

[19] Instead of relying on the statutory language, Defendant argues, "Plaintiff, however, was
not a party, signatory, nor third party beneficiary of [the VIEW Agreements].  Plaintiff does
not allege he had a contract with VIEW, only that, as part of his job, he performed duties in
relation to VIEW." (Def.'s Mem. Supp. Mot. Dismiss 15.)  The result is the same considering
this line of reasoning:  VIEW does not provide a private right of action for Plaintiff.

## IV.  *Conclusion*

For the foregoing reasons, the Court will DENY Defendant's Motion with regard to the defamation claim based upon Coles's statement to Tisdale only and GRANT Defendant's Motion to Dismiss with regard to all other claims.

Furthermore, since "the district court has dismissed all claims over which it has original jurisdiction," this case will be REMANDED to the Circuit Court for the City of Richmond for any further proceedings necessary. 28 U.S.C. § 1367(c)(3) (2006).

It will be SO ORDERED.

_____/s/_____
James R. Spencer
Chief United States District Judge

ENTERED this   26th   day of November 2008

28